# EXHIBIT C

This exhibit contains the text of each alleged ChatGPT "abridgment" from Exhibit 11 of CIR's Amended Complaint, *see* Dkt. 88-14 at 1–6, along with the text of the original articles referenced in the prompts CIR used to generate each abridgment. To facilitate comparison between each article and its alleged "abridgment," the text has been color-coded by general subject or theme.

# EXAMPLE 1

**The Mother Jones article "Why Is the Colorado River Running Dry?"** from the November-December 2023 issue delves into the multifaceted crisis affecting one of the most critical water sources in the Western United States. This detailed investigation highlights several key factors contributing to the Colorado River's alarming depletion.

1. Historical and Policy Failures: The article outlines how historical agreements and outdated policies have exacerbated the current water crisis. For example, the 1922 Colorado River Compact, which allocated water rights among seven states based on overestimated water flow data, has led to unsustainable water usage patterns (Mother Jones) (Mother Jones).

2. Agricultural Practices: A significant portion of the river's water is used for agricultural purposes, particularly in growing water-intensive crops like alfalfa. This crop alone consumes more than half of the water diverted from the river, which the article argues is an unsustainable practice that needs urgent reevaluation (Mother Jones) (Mother Jones).

3. Climate Change and Drought: Prolonged drought and rising temperatures due to climate change are reducing the river's flow. The snowpack in the Rocky Mountains, which feeds the river, has diminished, leading to less water during the crucial melt periods (Mother Jones).

4. Urban and Industrial Demands: The article also discusses how urban expansion and industrial activities, including oil and gas extraction, further strain the river. The increasing population in cities like Las Vegas and Phoenix demands more water, while industrial activities pollute and consume substantial quantities of water (Mother Jones).

5. Ecological Impact: The environmental consequences are severe. The reduced flow affects ecosystems and wildlife dependent on the river. For instance, native fish species and riparian habitats are threatened by the changing water levels and quality (Mother Jones).

6. Legal and Political Challenges: Addressing these issues is complicated by legal and political challenges. Water rights and management are contentious, with various stakeholders, including states, agricultural interests, and indigenous groups, often at odds over solutions (Mother Jones).

**ENVIRONMENT**

Why Is the Colorado River Running Dry?

It's not just drought. It's putting sacred cows above farmers, cities, and a secure future.

SCOTT CARRIER NOVEMBER+DECEMBER 2023 ISSUE

Water is life. It's also big business. In our November + December 2023 issue, Mother Jones dives into the West's deepening water crisis—and the forces behind it, from historic drought to short-sighted policies to corrupt lawmakers and the special interests they serve. Read the full package here.

If you draw it on a map, the Colorado River has the shape of a tree, with its trunk rooted in the Sea of Cortez and the branches reaching into the mountaintops of Wyoming, Utah, Colorado, New Mexico, and Arizona. Botanists call the shape of a tree a habit. It is a common form in nature, like an artery branching to capillaries or nerves reaching to fingertips. But there's always another part that isn't shown, a looping back to start over. The water runs down the mountains to the ocean that pumps it back to the mountains by way of clouds. The shape is really a circle. The cloud part is just hard to draw on a map.

If I'm being honest, the cloud part is a pretty weak effort, because the Colorado River begins and ends in a desert, a place of little precipitation. The clouds come laden from the Pacific Ocean but expend much of their water as they cross the Sierras and Cascades. By the time they get to the Colorado Plateau and the Rockies they have little water left to give. The Colorado River Basin is a watershed that covers a big area, roughly the size of Texas. The Columbia River watershed is about as large but carries 12 times as much water. The Mississippi watershed is five times larger than the Colorado's but carries 26 times as much water.

So we should admit and accept, up front, that the Colorado never was and never will be a mighty river system, and that it is climate--challenged and prone to drought. We never should have asked it for so much. We invaded it like cancer, turning water into property. I wish it wasn't so.

Most of the water in the river system—some 90 percent—falls as rain and snow in the mountains of the Upper Basin. To go back to the shape of a tree, the Lower Basin of the Colorado is the trunk, and the Upper Basin is the branches. Snowmelt from the upper branches in rural Colorado, Wyoming, and Utah runs downstream to supply the Lower Basin and the cities of Los Angeles, San Diego, -Phoenix, and Las Vegas. Because the river—the whole watershed or whole tree—is so prone to drought, we built the country's two largest reservoirs, Lake Mead and Lake Powell, near the top of the trunk, below the branches, to ensure the West's cities and farms don't run out of water.

The last time these two reservoirs were at full capacity was in the summer of 2000. In 2022, after 22 years of drought, both reservoirs were at about one-quarter of capacity. If that rate of decline were to continue, they'd both be empty in six years. The deluges of last winter bought us some time. But they don't change the fact that the Colorado River system is in dire straits. If the waterline drops below the dams' intake ports, their electromagnetic dynamos, which can

generate up to 3.4 gigawatts, will no longer be able to bring energy to 1.6 million people. After that comes the level called "dead pool," where the water drops below the reservoirs' outlet ports and can no longer flow through to the river's lower stretches.

Dead pool on Mead and Powell could mean people in Los Angeles, San Diego, Phoenix, and Las Vegas would not be able to wash their dishes or flush their toilets or get a drink of water from their hoses. These city-states could collapse. This is why people are freaking out about the Colorado going dry.

The problem at hand is clear: Somehow we need to find water to refill the reservoirs. We can't control the amount of precipitation that falls within the Colorado River watershed, but we can control how we use the water that's available. If we use less, there will be more to store in the reservoirs.

The river supplies 40 million people, the large majority living in cities, and you'd think this is where we could conserve a large amount of water. But it turns out that the cities—all the homes and lawns and golf courses and public parks and even the celebrity swimming pools—account for only 12 percent of what's drawn from the river. Industry, such as factories and power plants and data centers, uses another 8 percent. And the rest, 79 percent of what we take from the river, goes to agriculture.

This seems like a lot of water being used for farming, but it's actually a normal percentage compared with other river systems around the world; it takes a lot of water to grow food. What's not normal about the Colorado River, however, is that an enormous portion, as much as 70 percent, of the water devoted to agriculture goes to just two crops—alfalfa and grass—to make hay. When you do the math, this means that more than half the water siphoned from the Colorado River is used to grow food for beef and dairy cattle, as well as for some sheep and horses.

Most people are unaware of this fact. It gets mentioned in news stories from time to time, but it drops out of the conversation, which seems tied up in arguments about more efficient sprinklers and getting rid of golf courses.

We need to wake up, quickly. Using more than half the water we take out of the river to make hay is delusional. Colorado River Basin states produce only 15 percent of our nation's supply of hay—and by market value, 17 percent of that is exported overseas, mainly to China, Japan, and Saudi Arabia.

So if we stopped using Colorado River water to grow hay, our country would suffer just a 15 percent loss in hay production, but there would be enough water in the river to refill the reservoirs even as we continue to provide water to the growing cities.

One ton of Colorado River hay is worth about $275. It takes as much water to grow that 1 ton of hay—450,000 gallons—as it does to supply four average homes with water for one year. It takes about 1,800 gallons to produce one pound of beef. This means that every time I eat a quarter--pounder, I'm also consuming 450 gallons of water. This is not an efficient use of a scarce resource. It's like driving a semitrailer to the grocery store to buy a bag of chips.

To change this part of the system we first need to understand how things got this way, and to do this we must back up to when American settlement in the upper Colorado River Basin began. So let's go back to the map, a topographic map showing lines of elevation, one drawn by Colorado River explorer John Wesley Powell in 1878. It shows much of the Upper Basin of the Colorado River, the limbs of our tree. Almost all of the water in the river system falls as snow from clouds as they pass over mountain ranges in the Upper Basin. These ranges are part of the greater Rocky Mountain system, and it's common to think of them as forming one long wall that stands before the Great Plains, but they are actually more like a broad chain of islands, separate and isolated, floating in a vast ocean of sagebrush desert. In the winter, they become islands of snow.

Powell's topographic map shows the land in the Upper Basin he believed could be inhabited by settlers who were packing their bags to go west and stake their claims. It's a small amount of land, only 3 percent of the whole area, and it's all surrounding the bases of the snow island mountains—precious greenbelts from 6,000 to 10,000 feet above sea level. Everything below 6,000 feet—97 percent of the map—is desert. Everything above 10,000 feet is high alpine or tundra. But in between there are grasslands.

It takes a lot of water for grass to grow, and the mountains provide a lot of water, snow that runs off in sheets every spring, creating lush meadows in broad valleys at the base of the slopes. Think of the scenery in a Marlboro advertisement—all the green grass below a snowcapped mountain. Powell said people could survive here in small, isolated communities, but warned there was not enough water coming off the mountains to build any kind of city, because cities need a lot of food and the amount of arable land was just too small.

I'm on the southern slope of the La Sal Mountains in southeastern Utah, 8,000 feet above sea level. It's the middle of January and I'm standing atop 4 feet of snow, wearing sunglasses and cross-country skis. I came for the view and because I own some property near here. Two years ago, during Covid, I staked my claim on 10 acres, a place to build a refuge far from Salt Lake City, where I live. I've spent a lot of time since trying to understand the lay of the land.

Above me the slope rises quick and steep to the second-highest mountain in Utah, Mount Peale, at 12,700 feet above sea level. There's maybe 10 feet of snow up there. Down below, the slope drops away slowly to the start of the desert floor at 6,000 feet above sea level. It's dry down there, no snow on the ground. This slope factor is what causes the snow to fall. The clouds drift low across the desert floor from the west to the east, holding their vapor, but as they hit the slope of the mountain, they rise into cooler air that crystallizes the vapor, and it falls to the ground as snow. The higher the mountain, the cooler the air, the more snow that falls. All the snow islands are surrounded by a line, like a beach, where the white snow meets the purple sage of the desert.

From this spot at 8,000 feet, I can see the beachlines of four separate snow islands, 40 to 100 miles away, across the desert ocean floor. To the east, the San Juan Mountains in Colorado. To the south, Ute Mountain and the Abajos. And to the west, the Henry Mountains, the last range in the continental United States to be mapped and named, in 1872. It took that long for white explorers to get there because the desert floor is not calm and flat like it appears to be from up here. It's actually a maze of deep and narrow sandstone canyons cut by the water running off the

6

mountains. It was very difficult terrain for explorers to cross on horseback, which is why John Wesley Powell explored by boating the Colorado.

Native peoples had been here for at least 13,000 years, living along the streams and rivers coming off the mountains, some moving from the low desert in winter to the high grasslands in summer. Obviously there were many different groups over time, but from what we can tell many held at least one belief in common—that the snow islands were the sacred homes of spiritual beings and that water was the life force behind all creation.

The white people, however, believed the snow islands and water were material things, property, given to them by their god to build his kingdom on Earth. Native Americans were given no role in that story, and they were rounded up—those still alive after plagues, famines, and wars—and forced to live on land with the least economic value; i.e., land with the least water.

My 10 acres used to be part of a cattle ranch that was once the home of Navajo, Pueblo, and Ute tribes. I'm not proud of this chain of title, and I can't shake the feeling that I'm part of the problem, a symptom of the disease, which is growth for the sake of growth. I am a symptom of the cancer on the land.

Anyway, right below where I'm standing, at the base of Mount Peale, there's a canal buried under all this snow. The canal is the real reason I came here, something I want you to see. It's about 15 feet wide, 4 to 6 feet deep, and when it's not covered by snow you can watch the stream of water running in the groove across the slope of the mountain.

This canal, called the La Sal Livestock Ditch, was built by men and horses more than a century ago. It diverts water—all the water—from La Sal Creek and carries it to fields of alfalfa and grass more than 10 miles away. There are canals like this surrounding all the snow islands. They all divert streams from their natural paths and riparian zones to flood-irrigate fields of alfalfa and grass often many miles away. Canals are the way—the only way—this kind of agriculture happens in the Upper Basin of the Colorado River.

John Wesley Powell tried to explain this in his Report on the Lands of the Arid Region of the United States, published in 1878. It begins with this statement:

The eastern portion of the United States is supplied with abundant rainfall for agricultural purposes, receiving the necessary amount from the evaporation of the Atlantic Ocean and the Gulf of Mexico; but westward the amount of aqueous precipitation diminishes in a general way until at last a region is reached where the climate is so arid that agriculture is not successful without irrigation.

People back east had heard of agriculture through irrigation, but they'd never actually done it because they didn't need to. The climate back east is humid, with "abundant rainfall for agricultural purposes." Powell's report was a warning to prospective settlers who only knew this kind of environment. He said, essentially, "Don't go west thinking it will be like anywhere you've ever been, unless you've been to Mongolia and seen the Gobi. It's all an arid region where you're going to have to dig canals to survive."

7

Digging a canal is too much work for one man, or even a whole family. A canal requires the labor of a community over a long period of time. Powell suggested that settlers follow the social organization of the Mormon pioneers who had been surviving at the base of the mountains for 25 years before he arrived. They owned land as individuals, but cooperated under -ecclesiastical control to build canals and manage the water.

It was all about grass and water. They grazed cattle and sheep on native grasslands up on the mountain and made hay on land below at the edge of the desert where the temperatures are warmer, permitting a longer growing season. They built their homes next to their fields, and they built canals to bring water to their fields, and they grew enough food to feed themselves and their animals over the long, cold, snowy winters. This was how white people could survive out here.

In order for the early pioneers to successfully farm in the Upper Basin of the Colorado, a new kind of water law needed to be written. Our water law came from British common law, which said that no one can own water because it's like sunlight, res communes, common to all and property of none.

What could be owned, however, was a right to use water for reasonable purposes, under these conditions: 1) You had to own property next to a source of water, such as a spring, river, or lake; 2) You had to use the water on your property, such as for a mill or iron foundry; and 3) You couldn't pollute it or use so much water as to deprive people downstream from their use of the water on their land. This is called riparian law, and it worked well enough in the British Isles and the eastern United States because both have humid climates where irrigation is unnecessary.

But in an arid climate water needs to be moved. So the new law got rid of the part about how water rights had to be linked to its natural source. Under the new law, distant landowners had a right to water from a stream, river, or lake if they could show that they would use it for beneficial purposes, such as mining or agriculture, in another location. Building canals was the way to exercise this right and to bring water to another location quite separate from its natural path.

The problem is that, when you separate water from its source by putting it in a canal, it becomes a commodity, like electricity in a wire or oil in a pipeline. Commodities can be bought and sold on the open market and are at risk of monopolization. Powell believed canals were absolutely necessary, but that there were risks involved:

The magnitude of the interests involved must not be overlooked. All the present and future agriculture of more than four-tenths of the area of the United States is dependent upon irrigation, and practically all values for agricultural industries inhere, not in the lands but in the water. Monopoly of land need not be feared. The question for legislators to solve is to devise some practical means by which water rights may be distributed among individual farmers and water monopolies prevented.

The solution they came up with was to sever the water rights from the land where the water comes from and give them to the land where it is used. Powell phrased it this way:

The right to use water should inhere in the land to be irrigated, and water rights should go with land titles.

But then there was the basic problem of there not being very much water to begin with. The earliest explorers and pioneers who came from the east to the Upper Basin knew right away, just by looking around, that the naturally irrigated land, the grassland beaches wrapping around the mountains, was scarce, and someday soon, with western expansion, there wouldn't be enough of this land with water to go around.

So the new water law was written under the rule of first come, first served. The first people to build a canal diverting water from a stream would have the first appropriation of the water from the stream. The people who built the second canal would have the second appropriation, and so on down the line. When there wasn't enough water in the stream for everybody, such as in times of drought, the people on the bottom of the list would be the first to lose their appropriation. This is why they called it the law of prior appropriation.

Under prior appropriation, each new water right would describe the location of the diversion and the amount of water to be diverted, as well as the precise location of the land where the water was to be used for a specific beneficial purpose, such as irrigation to produce hay. If you didn't use your water, every year, for the described beneficial purpose, your right would be forfeited—"use it or lose it." Furthermore, these rights would be ranked by the time of their appropriation. Prior appropriation laws were eventually adopted by all the states along the Colorado River.

In his Report on the Lands of the Arid Region, Powell described the coverage of grass in the mountains as "scant." But Powell was a geologist, not a cattleman. There are many accounts from early settlers in the Upper Basin that describe lush meadows—"the country was a wave of grass" that grew "high enough to hide a saddle horse if his head was down feeding."

Perhaps Powell was describing the grass on open slopes, and the settlers were talking about the grass in the riparian zones along streams that ran year-round. At the base of a mountain, on a gentle slope, a stream will meander, creating meadows with tall grass sending roots deep into the ground. These roots create something of a sponge, holding water and soil to the benefit of other plants and animals—flowers, shrubs, insects, birds, and mammals— including beavers. Beaver dams, like the grass, slowed the flow of water running off the mountain. Together, they ensured the snow islands were surrounded by lush meadow sponges that sat between 8,000 and 10,000 feet.

The grasslands were all open range, there for the taking, and the early settlers grazed these riparian areas like miners extracting veins of gold and silver. By 1870 there was a railroad running across the country, and cattle corporations based in New York, London, Texas, and Pittsburgh soon brought in more than 100,000 animals to feed on the grassland beaches wrapping the mountain islands, before corralling them back onto trains in the fall bound for slaughterhouses in Chicago and San Francisco. They boasted of annual profits of 40 percent, but after 10, maybe 20, years of overgrazing, the tall grass was gone, eaten down to bare rock, killing the roots, drying up the sponges, and the first floods ripped gutter arroyos straight through the meandering meadows, lowering the water table, creating places where only sagebrush and rabbitbrush would grow, turning grassland into desert. The veins of gold and silver were gone— and they will never come back.

By the turn of the last century the mountains in the Upper Basin had reached their limit for growth and development.

The 3 percent of land capable of supporting agriculture had been claimed and all available water rights appropriated. Much of the grass was gone, but ranching continued on a smaller scale. People kept moving west, settling in areas just outside the Colorado River Basin where the land was lower and flatter, making it easier to farm and more productive. The city of Denver (elevation 5,280 feet) grew up along the eastern slope of the Front Range. The city of Salt Lake (4,300 feet) prospered in the Wasatch valley. And down beyond the bottom of the river there was Los Angeles at the base of the Santa Susana Mountains. These places were part of the arid region described by Powell, but their nearby mountains provided enough water for farming and city life. At least in the beginning.

In 1890 the population of Denver was 107,000. By 1910 it had doubled to 213,000. Salt Lake City went from 45,000 to 93,000. Los Angeles boomed from 50,000 to 319,000. It was clear there wasn't enough water in local streams and rivers to support this kind of growth, so the cities looked over their ridgelines to the Colorado River Basin, where there was still a lot of water running all the way to the Pacific Ocean. Under the law of prior appropriation, the water was there for the taking. All they had to do was build canals or tunnels to bring the water around or through the mountains.

These projects were big and expensive, but the water was worth a lot more money once it was outside the basin. And so in 1902 the federal government created what became the Bureau of Reclamation to plan and oversee the construction of an immense system of canals, pipelines, and dams. It took billions of dollars and most of the 20th century to build a system to sustain the West's growing population. Down where the Colorado River crosses into Mexico, near Yuma, Arizona, we built the Imperial Dam and the 81-mile-long All-American Canal to bring water to California's Imperial Valley. Moving upstream, we built the Parker Dam, creating Lake Havasu with two aqueducts—one 242 miles long, the other 336 miles long—to bring water to Los Angeles and Phoenix. Farther north, we built the two largest dams in the United States—Hoover and Glen Canyon—to hold a four-year supply of water in Lake Mead and Lake Powell. Of the 40 million people the Colorado River supplies, about 20 percent don't even live in its watershed. It's an amazing system. Unfortunately, it's now tapped out.

There's a graph that shows two lines. One is the amount of water that flows through the Colorado River every year since 1920. The other shows the amount of that water consumed by humans every year since 1920. The line showing water supply stays level, averaging about 15 million acre-feet a year. (An acre-foot is 325,851 gallons, which is how much water it takes to cover an acre in 1 foot of water.) The line showing consumption starts at about 5 million acre-feet in 1920 but climbs steadily until it crosses the line showing supply around 2003. Ever since, we've been using more water than the river has to offer. We've been surviving by drawing down the reserves in the reservoirs and now the reservoirs are close to being empty. Which brings me back to where I started.

The reason why more than half the water we take from the Colorado River is used to grow hay is that the first water rights were appropriated for growing hay, and these rights still exist. The ranches and farms in the Upper and Lower basins have changed hands many times

over, but the land titles and water rights have stayed tied together, with their order of priority maintained. So a ranch that was using 10,000 acre-feet of water to produce hay in the late 1800s is still using 10,000 acre-feet of water to produce hay today.

If they don't use their water to irrigate their hay fields, they lose their right to the water. So growing hay used to be a matter of survival, but is now more like a retirement account.

Hay prices go up and down depending on market forces and weather that can ruin years of planning and hard work. And it's not a lucrative business. There's just not a lot of profit in growing hay or raising cattle.

But farmers and ranchers don't grow hay and raise cattle to make money—they do it in order to keep their land and water. Because if they don't use their water to irrigate their hay fields, they lose their right to the water, and land in a desert is worthless without water. A cattle ranch is an investment.

If you can hold on to your ranch by just squeaking by, the value of your land and water just keeps going up and up and up. So, more than half the water we take from the Colorado River is being used to produce hay largely because growing hay used to be a matter of survival but is now more like a retirement account.

The quickest, most efficient way to put water in the reservoirs would be to amend Western water law, state by state, to allow hay producers to keep their water rights if they don't use their water. Then they could lease their water at a profit to refill the reservoirs. If they are in the Upper Basin, they'd close their canals and let the water run its natural course to Lake Powell; if they are in the Lower Basin, they'd simply stop watering their fields and let the water stay in Lake Mead. Their water is worth more, much more, in the reservoirs than on their fields.

To a small degree, this is already happening. Agricultural users have been allowed to enter into water leases to protect the environment and improve recreational areas for decades. And Congress just passed a law allowing the Colorado River Indian Tribes, a federally recognized group whose reservation spans the river south of Lake Mead, to lease water to Arizona. (Only recently were tribes in the Colorado River Basin given any meaningful water rights, and even now, because little infrastucture was ever built on tribal lands, they tend to be rights on paper only.) And Utah recently passed a law allowing hay farmers to send their water downstream to help refill the Great Salt Lake, but so far few have taken the state up on it, citing fears that the water will just flow to other ranchers.

But, theoretically at least, we could refill Lake Mead and Lake Powell within 12 years by leasing water that is now being used to produce hay—about 3 million acre-feet a year. If we were to lease 3 million acre-feet of water at an average price of $400 an acre-foot—a typical rate in Lower Basin states—it would cost about $1.2 billion a year. This is a lot of money, but when you divide it by 40 million users, it's only about $30 per person per year. This is a much better scenario than not being able to flush your toilet, or than having both reservoirs running dry.

I'm not saying we should do it. There would be downsides, negative consequences, for sure. Leased water is a commodity subject to supply and demand. In times of drought, like now, the price could skyrocket. In Utah, many water rights are held by collective irrigation and canal

companies—a legacy of the Mormon communes of Powell's time—and a majority of the shareholder farmers must sign off on any leases to the state. And large-scale water leasing could also mean the demise of the Western cowboy. A water lease essentially pays a rancher not to grow hay to raise cattle; that is, a water lease pays cowboys not to be cowboys. The only work a rancher has to do is open the diversion dam on his canal and let the water run downstream. The lease pays more than he can make by producing hay, beef, or dairy products, so why go through all that roping and wrangling? The money is already in the bank. Soon no one would be singing:

Whoopee ti yi yo, git along little dogies. It's your misfortune and none of my own.

I have some good friends who would lose no love if the Western cowboy were to disappear. They believe cattle are bad for the environment. But I eat meat, and I like some cowboys more than I like some environmentalists. The cowboy is a big part of American culture, the romantic myth part, Rio Bravo, High Noon. I don't even like horses very much, but I'd be lying if I said the cowboy way has been of no value in my life.

It's time to talk to Hardy Redd, an actual rancher who's lived here all his life. He's 87 years old, son of a man who started ranching in the La Sal Mountains around the turn of the 20th century. Members of the extended Redd family now graze cattle across much of the southern slope of the La Sals, and they own the rights to a lot of water coming off the mountain, including most of the water in the La Sal Livestock Ditch, which goes to Hardy's farm.

Hardy's house is modest, if not frugal—not what I imagined as the home of a former state representative and the patriarch of one of the most successful ranching families in the Upper Basin. We sit in his office area in the living room, surrounded by books and under a wall plaque of a Mormon temple. I'm not a member of the LDS church and I probably voted for a different candidate in the last presidential election, but I felt at ease in Hardy's house, perhaps because he seemed genuinely interested in what I had to say.

I ask him if he's heard about the state's new water leasing programs, and he says he hasn't. So I explain the idea as best I can, then ask him what he thinks is a fair price per acre-foot of his water, and he avoids the question. Ranchers usually don't want to talk about how many cattle or how much water they have. It's sort of like asking someone how much money they have in the bank. So I ask him if he's worried about the ranching way of life coming to an end.

"I have mixed feelings," he says. "And I need to be careful how I talk about this because I'll offend my neighbors who feel deeply that the cowboy way should not be done away with. They see it like, 'A man who sells out is selling his soul.' And I recognize it."

"Would you feel like that?" I ask.

"There's something about it getting in your blood," he says. "There's this nostalgia—'This is the only lifestyle or business on earth.' It's kind of chauvinistic—'We're No. 1.' I see a lot of this in livestock people, and I don't know whether they're afraid they can't do anything else, or that there's glamour or romance in it in the eyes of the world. Some of it is really genuine—'My dad, granddad, and great-granddad came here and worked their heart out to get this place in shape, and I'm not going to let them down.' There's that kind of pride. And pride is a good thing, except when it's not."

12

"My dad was enlightened on this. He told us, 'You don't have to be a rancher just because I was a rancher.' He could see that life was going to get more complicated and farm labor was going to be harder to acquire. He said, 'Ranching is not a lucrative business. You have a big investment in land and livestock, but the returns are usually lower than other businesses. You can have a good life, if you're careful and prudent, if that's what you want to do. But there are other investments that are far more valuable."

"So you're a cowboy," I say, "but you're not attached to it. You're not afraid to see it go away?"

"Maybe," he says. "A horse and buggy is good to see on the screen and romantic and life was supposedly simpler. But horses ran away and killed people. People don't remember that. And so I'm nervous about people standing in the way of progress. I think a growing dynamic economy that enriches more people to a greater extent is better than hanging on to the past, or even the present. I don't want my freedom to innovate, or other people's freedom to innovate, to be restricted."

"Some things are inevitable," he says. "I hate to say it, and it sounds really bad, but economics really rules a lot of our lives. It's kind of inevitable that this land has a higher use. Just like the land you bought up there. I don't like the subdivision, but one of my mantras is property rights are sacred. People have the right to do what they want."

"But," he added, "one thing I found in life, and also by serving in the legislature, is you never do just one thing. There's always unexpected consequences that come up, things you don't anticipate. You ever see a movie called Chinatown?"

Last winter we had record snowfalls, and when I ski along Hardy's canal in the middle of April it is full of water, almost overflowing, like the levees are going to break. Everybody is happy because come summer there will be enough water to go around, and the reservoirs will go up instead of down. This buys us some time, at least a little bit.

The Biden administration has pledged $4 billion from the 2022 Inflation Reduction Act for "conservation efforts in the Colorado River Basin and other areas experiencing similar levels of drought." Much of this money will go to rebuilding existing infrastructure and improving efficiencies of canals and irrigation systems.

A little over a billion of that money will be used to buy water leases in the Lower Basin. But the Upper Basin has been allocated only $125 million for its leasing program, and it seems to be failing. States in the Upper Basin, particularly Colorado, are not pushing leasing, perhaps because they have yet to figure out how to ensure the water ends up in Lake Powell. The farmers and ranchers are not signing up. Even if they can make more money from leasing water than from growing hay, they are cautious about changing their business models and their way of life. Leasing their water would mean getting rid of some of their animals and firing ranch hands. Communities would be affected by the loss of jobs. Schools might close. And what are they going to do when they get up in the morning? What will they be if not ranchers?

This past May, the Lower Basin states—Arizona, Nevada, and California—agreed on an emergency stopgap measure to conserve 3 million acre-feet over the next three years, but this

will not be enough to make a real difference. Meanwhile, the Upper Basin states—Utah, Colorado, Wyoming, and New Mexico—have no plan for conserving 2 million to 4 million acre-feet of water, as they have been urged by the Bureau of Reclamation to do.

Four billion dollars in the IRA isn't going to be enough to solve the problem. There are too many people living in the desert and there will be more tomorrow and the next day, and snow clouds can't be bought. But there is enough water in the Colorado River, even under present drought conditions, to support 40 million people if we stop using more than half of what we take from it to grow food for livestock, though apparently we can't figure out how to do that, or even if we should.

At the end of June, I'm standing at the barbed wire fence that separates my land from US Forest Service property, watching some cows and calves graze on new grass and flowers. Behind them is Mount Peale, still holding snow in the couloirs. The sky is dark blue and there's a cloud sitting over the peak like a hat. It's a beautiful, idyllic scene. The baby cows running around in the meadow seem like they belong here more than I do, but the writing is on the wall. They—or at least their food—are going to have to go to another part of the country because humans in Salt Lake, Phoenix, San Diego, and Los Angeles need their water. It's not happening yet, but it seems inevitable. The cities need water in order to exist, and the snow islands of the Upper Basin are the easiest, cheapest place to get it. I come from one of those cities, and I'm working on building a house out here because I know my city is doomed. I want to live here and go back to when the mountain was inhabited by spiritual beings and water was the life force behind all creation.

# EXAMPLE 2

**The article "There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It" published by Mother Jones,** debunks a viral Facebook post that falsely claims to provide official COVID-19 advice from Stanford University. The article highlights the spread of misinformation during the pandemic and emphasizes the importance of verifying information from credible sources.

Beginning

The article opens by describing the viral post, which includes several claims about COVID-19 symptoms and preventive measures. For example, it falsely states that if you have a runny nose and sputum, you have a common cold, not COVID-19, which supposedly only causes a dry cough. It also claims the virus can be killed by sunlight or temperatures as low as 26-27 degrees Celsius, and that sneezes from infected individuals travel only about 10 feet before falling to the ground. These points are quickly debunked by experts who explain that such simplistic diagnoses and measures are misleading and not supported by scientific evidence (Mother Jones) (Mother Jones).

Middle

The article then discusses the broader issue of misinformation during the pandemic. It points out how social media platforms like Facebook and Twitter have struggled to control the flood of false and toxic content. The article quotes experts who explain that the proliferation of misinformation is driven by a lack of authoritative sources, high public anxiety, and the human tendency to share information as a way of coping with uncertainty. This environment creates opportunities for misinformation to spread, as people are more likely to share content that seems helpful or credible, even if it is not (Mother Jones) (Mother Jones).

End

In conclusion, the article emphasizes the need for individuals to practice "information hygiene" by critically evaluating the sources of information they encounter online. It advises against sharing posts that sound suspicious or lack credible backing. The article closes by urging readers to rely on trusted sources such as the CDC and WHO for accurate and up-to-date information about COVID-19, and to avoid spreading unverified claims that can contribute to public confusion and panic (Mother Jones) (Mother Jones).

By detailing the specific false claims and providing expert commentary, the article aims to educate the public on the importance of verifying information and the dangers of misinformation, particularly during a global health crisis.

16

**POLITICS**

MARCH 11, 2020

There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It.

No, you can't test yourself by holding your breath, and other claims debunked.

ABIGAIL WEINBERG

News WriterBio | Follow

The coronavirus is a rapidly developing news story, so some of the content in this article might be out of date. Check out our most recent coverage of the coronavirus crisis, and subscribe to the Mother Jones Daily newsletter.

If you've opened Facebook or Twitter in the past few days, you might have come across a post with alarming information about the coronavirus attributed to Stanford University.

The post goes something like this: People with coronavirus may not show symptoms for several days, but if you can comfortably hold your breath for more than 10 seconds, you're probably not infected. You should sip water every 15 minutes to wash the virus into your stomach, where stomach acid kills it, to prevent the virus from entering your windpipe and lungs. And if you have a runny nose, you have a cold, not the coronavirus.

Most of this is false.

I emailed Stanford's office of communications to check the post's authenticity. "The post is not from Stanford," Lisa Kim at Stanford Health Care wrote back. She directed anyone who is confused to the university's actual coronavirus information page.

Then I called Loren Rauch, a community ER doctor at Antelope Valley Hospital in Los Angeles with a master's degree in epidemiology, to dispel some of the rumors circulating online. The statements in bold are quotes from the viral Facebook post, and Rauch's responses—lightly edited for length and clarity—follow.

"The new coronavirus may not show signs of infection for many days. By the time you have fever and/or cough and go to the hospital, the lung is usually 50 percent fibrosis."

That doesn't mean anything. Fibrosis is a late scarring process. You may have 50 percent of your lung affected by the virus, causing pneumonia or fluid in your lungs. But fibrosis—that is not correct.

If you can breathe fine, do not go to the doctor. Only go if you cannot breathe or are very ill.

17

"Taiwan experts provide a simple self-check that we can do every morning: Take a deep breath and hold it for more than 10 seconds. If you do this successfully without coughing, without discomfort, stiffness or tightness, there is no fibrosis in the lungs; it basically indicates no infection. In critical times, please self-check every morning in an environment with clean air."

That's not true. That can check if you are anxious or have respiratory compromise.

"Everyone should ensure your mouth and throat are moist, never dry. Take a few sips of water every 15 minutes at least. Even if the virus gets into your mouth, drinking water or other liquids will wash them down through your throat and into the stomach. Once there, your stomach acid will kill all the virus. If you don't drink enough water regularly, the virus can enter your windpipe and then the lungs. That's very dangerous."

Totally bogus. That's not real.

"Drinking warm water is effective for all viruses. Try not to drink liquids with ice."

No.

"If you have a runny nose and sputum, you have a common cold. Coronavirus pneumonia is a dry cough with no runny nose."

Editor's note: On this one, we thought new research might help: A pre-print study by a group of German researchers suggests that upper respiratory tract symptoms like runny nose may be more common than previously thought.

However, the CDC still emphasizes fever, cough, and shortness of breath as the main symptoms. And Whitney Adams, a former pandemic preparedness coordinator and programs manager for CARE, issued a word of caution when considering the deluge of non-peer-reviewed research information relating to the coronavirus. "While it's really important for the research community, the medical community, public health community keep sharing these findings, we should take those with a grain of salt," she said.

"It's not necessarily helpful for people to try to self diagnose based on these things that are really hard for even clinicians to understand," Adams said.

So the short answer is: It's complicated.

"This new virus is not heat-resistant and will be killed by a temperature of just 26/27 degrees Celsius (about 77 degrees Fahrenheit). It hates the sun."

If something's in sunlight, it's going to get disinfected pretty quickly, because that's ultraviolet light, just the same type of sanitation we use in hospitals. The temperature in a dryer, for example, would kill everything. But just, like, "It's gonna be a warm day today. We don't have to worry about coronavirus," I don't think that's gonna work.

"If someone with coronavirus sneezes, it goes about 10 feet before it drops to the ground and is no longer airborne."

The general rule of thumb we're using is about six feet.

The bottom line is that "there's a lot of misinformation floating around," said Adams, who noted she received an email containing the text of the false viral Facebook post last week. So to prevent the spread of rumors, do the information equivalent of social distancing: If someone posts something that sounds even the slightest bit fishy, don't pass it on.

Thanks. Can you summarize all of the examples of misinformation the article discusses

The article "There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford.

Don't Believe It" discusses several examples of misinformation circulating during the COVID19 pandemic. Here are the main examples highlighted:

1. Symptom Misidentification: The viral post claims that if you have a runny nose and sputum, you have a common cold, and not COVID-19, which allegedly only causes a dry cough. Experts explain that COVID-19 symptoms can vary and can include a runny nose, making this claim false and misleading (Mother Jones) (Mother Jones).

2. Temperature and Sunlight: The post falsely claims that the virus is not heat-resistant and will be killed by temperatures as low as 26-27 degrees Celsius (about 77 degrees Fahrenheit) and that it "hates the sun." Experts counter this by noting that while UV light from the sun can disinfect surfaces, such simplistic assertions about temperature are not scientifically accurate. The virus can survive in a range of temperatures (Mother Jones) (Mother Jones).

3. Sneezing Distance: Another false claim in the post is that a sneeze from an infected person can travel about 10 feet before dropping to the ground and becoming nonairborne. The general rule provided by health experts is to maintain a distance of about six feet from others to reduce transmission risk, but the dynamics of droplet spread are more complex than the post suggests (Mother Jones).

4. Drinking Water: Earlier misinformation, spread via chain emails and social media, suggested that frequently drinking water could help prevent infection by "washing" the virus into the stomach where it would be killed by stomach acid. This advice is unsubstantiated and incorrect, as it oversimplifies how viral infections occur and spread (Mother Jones).

5. Facebook and Social Media Misinformation: The article also discusses how social media platforms have been inundated with false information about the pandemic. The spread of misinformation is exacerbated by the lack of authoritative sources, public anxiety, and the human tendency to share information to make sense of uncertain situations (Mother Jones) (Mother Jones).

These examples illustrate the dangers of spreading unverified information, especially during a health crisis, and underscore the importance of relying on credible sources for accurate and up-to-date information.

**POLITICS**

MARCH 11, 2020

There's a Facebook Coronavirus Post Going Viral Claiming to Be From Stanford. Don't Believe It.

No, you can't test yourself by holding your breath, and other claims debunked.

ABIGAIL WEINBERG

News WriterBio | Follow

The coronavirus is a rapidly developing news story, so some of the content in this article might be out of date. Check out our most recent coverage of the coronavirus crisis, and subscribe to the Mother Jones Daily newsletter.

If you've opened Facebook or Twitter in the past few days, you might have come across a post with alarming information about the coronavirus attributed to Stanford University.

The post goes something like this: People with coronavirus may not show symptoms for several days, but if you can comfortably hold your breath for more than 10 seconds, you're probably not infected. You should sip water every 15 minutes to wash the virus into your stomach, where stomach acid kills it, to prevent the virus from entering your windpipe and lungs. And if you have a runny nose, you have a cold, not the coronavirus.

Most of this is false.

I emailed Stanford's office of communications to check the post's authenticity. "The post is not from Stanford," Lisa Kim at Stanford Health Care wrote back. She directed anyone who is confused to the university's actual coronavirus information page.

Then I called Loren Rauch, a community ER doctor at Antelope Valley Hospital in Los Angeles with a master's degree in epidemiology, to dispel some of the rumors circulating online. The statements in bold are quotes from the viral Facebook post, and Rauch's responses—lightly edited for length and clarity—follow.

"The new coronavirus may not show signs of infection for many days. By the time you have fever and/or cough and go to the hospital, the lung is usually 50 percent fibrosis."

That doesn't mean anything. Fibrosis is a late scarring process. You may have 50 percent of your lung affected by the virus, causing pneumonia or fluid in your lungs. But fibrosis—that is not correct.

If you can breathe fine, do not go to the doctor. Only go if you cannot breathe or are very ill.

"Taiwan experts provide a simple self-check that we can do every morning: Take a deep breath and hold it for more than 10 seconds. If you do this successfully without coughing, without discomfort, stiffness or tightness, there is no fibrosis in the lungs; it basically indicates no infection. In critical times, please self-check every morning in an environment with clean air."

That's not true. That can check if you are anxious or have respiratory compromise.

"Everyone should ensure your mouth and throat are moist, never dry. Take a few sips of water every 15 minutes at least. Even if the virus gets into your mouth, drinking water or other liquids will wash them down through your throat and into the stomach. Once there, your stomach acid will kill all the virus. If you don't drink enough water regularly, the virus can enter your windpipe and then the lungs. That's very dangerous."

Totally bogus. That's not real.

"Drinking warm water is effective for all viruses. Try not to drink liquids with ice."

No.

"If you have a runny nose and sputum, you have a common cold. Coronavirus pneumonia is a dry cough with no runny nose."

Editor's note: On this one, we thought new research might help: A pre-print study by a group of German researchers suggests that upper respiratory tract symptoms like runny nose may be more common than previously thought.

However, the CDC still emphasizes fever, cough, and shortness of breath as the main symptoms. And Whitney Adams, a former pandemic preparedness coordinator and programs manager for CARE, issued a word of caution when considering the deluge of non-peer-reviewed research information relating to the coronavirus. "While it's really important for the research community, the medical community, public health community keep sharing these findings, we should take those with a grain of salt," she said.

"It's not necessarily helpful for people to try to self diagnose based on these things that are really hard for even clinicians to understand," Adams said.

So the short answer is: It's complicated.

"This new virus is not heat-resistant and will be killed by a temperature of just 26/27 degrees Celsius (about 77 degrees Fahrenheit). It hates the sun."

If something's in sunlight, it's going to get disinfected pretty quickly, because that's ultraviolet light, just the same type of sanitation we use in hospitals. The temperature in a dryer, for example, would kill everything. But just, like, "It's gonna be a warm day today. We don't have to worry about coronavirus," I don't think that's gonna work.

"If someone with coronavirus sneezes, it goes about 10 feet before it drops to the ground and is no longer airborne."

The general rule of thumb we're using is about six feet.

The bottom line is that "there's a lot of misinformation floating around," said Adams, who noted she received an email containing the text of the false viral Facebook post last week. So to prevent the spread of rumors, do the information equivalent of social distancing: If someone posts something that sounds even the slightest bit fishy, don't pass it on.

# EXAMPLE 3

**The 2021 Mother Jones article titled "A Jim Crow–Era Murder. A Family Secret. Decades Later,**

What Does Justice Look Like?" delves into a historical murder case from the Jim Crow era and its lingering impact on a family. The article recounts the story of a Black man who was killed in the 1950s under suspicious circumstances, possibly due to racial motivations. Despite the passage of decades, the family has carried the weight of this unresolved trauma and the injustice surrounding it.

The author explores how the murder has been a haunting presence in the family's history, shaping their understanding of racial violence and justice in America. The article examines efforts by family members and activists to unearth the truth about the murder, seeking acknowledgment and redress for the racial injustice suffered by their ancestor.

Moreover, the article reflects on broader themes of racial inequality, systemic racism, and the ongoing struggle for justice in cases that remain unresolved due to historical neglect or deliberate suppression of evidence. It underscores the enduring impact of racial violence on Black communities and the complexities of seeking justice decades after such atrocities occurred.

Overall, "A Jim Crow–Era Murder. A Family Secret. Decades Later, What Does Justice Look Like?" serves as a poignant exploration of historical trauma, racial justice, and the quest for closure in the face of America's troubled past.

**CRIMINAL JUSTICE**

A Jim Crow–Era Murder. A Family Secret. Decades Later, What Does Justice Look Like?

Inside a movement to reinvestigate hundreds of racist killings.

SAMANTHA MICHAELS

NOVEMBER+DECEMBER 2021 ISSUE

Joyce Faye Nelson-Crockett was 13 years old in 1955, dancing to a jukebox in the Hughes Cafe on a Saturday night in East Texas with her sister and her 16-year-old cousin, John Earl Reese. The boy had come home to the nearby town of Mayflower earlier that day after a summer away picking cotton, and he held Nelson-Crockett's hand as he spun her around the room. All of a sudden, a sharp crack interrupted the music. Nelson-Crockett thought it was fireworks at first, until she heard a thud on the floor and noticed Reese lying there. "I looked and saw his brain coming out of his head," she later told a reporter. She felt warm liquid running down her arm and saw that she'd been struck, too, in her wrist. Her 15-year-old sister also took a bullet in the shoulder. Nelson-Crockett later learned that two white men shot through the cafe windows from their car because they were angry that local politicians had agreed to spend money on a school for Black kids.

Reese died from his wounds. But the gunmen never spent a day in prison. "I felt terrible then. Still do," Nelson--Crockett told the Fort Worth Star-Telegram in 1989. "I guess I will until I'm dead." She'd been close with her cousin, who had lived down the street from her and walked with her to catch the bus, often making her laugh when she was having a bad day. The county government didn't seem to care about the way his life had been cut short: Its records listed Reese's death as an accident, despite plenty of evidence, including the killers' confessions, that he'd died in a racist murder.

The county listed Reese's death as an accident, despite plenty of evidence, including the killers' confessions, that he'd died in a racist murder.

In the decades following the shooting, Nelson-Crockett didn't talk much about Reese to relatives. The family lost all its photos of him during fires that destroyed her house and her grandmother's house. By the time she reached middle age, she worried that if she spoke about his murder, her granddaughter, whom she was raising, might look at their neighbors differently or feel unsafe at school; some of the shooters' relatives likely still lived in the area. So Nelson-Crockett kept the memories buried and tried to stay busy farming her land. "I don't ever understand what could be done," she told the Longview News--Journal in 2009, when she was in her late 60s. "Nothing you do will bring him back."

That year, Nelson-Crockett got a phone call that would change the course of her family's story. On the other end of the line, a law student in Massachusetts named Kaylie Simon claimed to have new information about the shooting and asked whether Nelson-Crockett would be open to a meeting. Nelson-Crockett was surprised by the question, and a little anxious. For decades, she'd carefully averted her eyes whenever she drove near the pine tree–filled lot where the

Hughes Cafe once stood. But she also felt relieved to hear from someone who cared about a part of her life that few white people had taken seriously.

Simon was investigating Reese's death as part of Northeastern University School of Law's Civil Rights and Restorative Justice Project. Its researchers examine racialized killings between 1930 and 1970, during the Jim Crow era and its immediate aftermath. They dig up new information about unsolved murders, push officials to set the record straight, and ask surviving family members what they need to heal.

The project, launched in 2007, is the brainchild of Northeastern professor Margaret Burnham, an attorney, former judge, and lifelong civil rights activist. "I became interested in learning how many cases were incomplete, in the sense that no judicial proceedings ever addressed the harms that had befallen these people and the trauma experienced by their families," she told me. It bothered her that so many of these stories had not been recorded.

For more than a year, the country has been gripped by a racial reckoning caused by the high-profile killings of George Floyd, Breonna Taylor, Ahmaud Arbery, and other Black men and women. The reckoning has fueled a public desire to reexamine murders that happened decades ago and still haunt surviving families, some of whom have struggled to recover because no one in power ever acknowledged their pain. Today, the official records of these older killings are often inaccurate. If they aren't corrected soon, the true stories may never come out; many witnesses to the crimes of the Jim Crow era are aging and dying.

Burnham's law and journalism students are racing to fill in details about racially motivated murders that were never properly investigated.

Before these memories fade, Burnham's law and journalism students are racing to fill in details about racially motivated murders that were never properly investigated. They sometimes spend years looking into a single case, with help from Burnham, two other professors, a couple of attorneys, an archivist, and a historian. It's like "legal archaeology," Burnham says. The students read old newspapers, travel to Southern towns to obtain court transcripts, and speak with surviving families. "It's really not enough to say, 'Those were horrible days,' and let them pass," Burnham told the Northeastern Law magazine in 2010. "The details matter. These stories are important, and to the extent these people are still around, their stories deserve to be told."

Prosecuting these murders often isn't possible because so much time has passed and many perpetrators have long since died. But there are other ways to make amends: In some instances, Burnham and the students have compelled officials to apologize for the lack of accountability and correct falsehoods in records. Her team focuses on restorative justice, a model of responding to violence that asks survivors how they were harmed and what they need to recover. Burnham's project is "part of a national reckoning that is underway," says Geoff Ward, a professor of African American history at Washington University in St. Louis. In June, President Biden nominated Burnham to serve on the newly formed Civil Rights Cold Case Review Board, a federal panel tasked with improving public access to records about unsolved murders of Black people during the civil rights era.

Uncovering this buried history, Burnham hopes, could also help ease the kind of intergenerational trauma that silence can mask, trauma that can seep through entire communities. Like Nelson-Crockett, many survivors have lived for years with secrets about what their families endured. When aging witnesses share their stories with relatives, it can unite them; "it becomes part of the book of sorrow of the family," Burnham says. Correcting records can help people feel heard. And situating their experience in the broader framework of American history, including by connecting survivors with other survivors, can allow them to feel less alone and empower them to become agents of social justice.

"It's absolutely vital work," says Kidada Williams, an associate professor at Wayne State University in Detroit who studies racist violence. For a long time, Williams says, historians who investigated lynchings "were looking at everything except the people directly impacted." While other scholars explored what these killings reflected about the press, the legal system, white people, and Black activists, Burnham's project is one of the largest of its kind to focus on the families.

Sharing these stories will be crucial, adds Nan Elizabeth Woodruff, a professor emeritus of African American history at Pennsylvania State University, if the nation is ever going to truly reckon with its history of racism. To address the harms Black Americans have suffered, we must first document and understand them. As Burnham puts it, "Healing requires truth."

Nobody knows how many Black people were killed in racist attacks during the Jim Crow era, which began in the late 1800s and lasted until the mid-1960s. While some civil rights martyrs are widely remembered—like 14-year-old Emmett Till from Chicago, who was abducted while visiting relatives in Mississippi in 1955, or the four girls who died when white supremacists bombed the 16th Street Baptist Church in Alabama in 1963—these deaths are only the tip of an iceberg whose full extent may never be accounted for. Many killings were never recorded, and when they were, government officials often condoned the violence or tried to hide what happened.

"There's this vast, invisible universe of unknown victims who were murdered far from a reporter's pen, or who the police never found out about or decided not to record for some reason," says Jay Driskell, a historian who is helping Burnham's students investigate these killings. Even with limited records, it's clear the death toll was enormous. The Alabama-based Equal Justice Initiative, a legal nonprofit, has documented the lynchings of at least 4,000 Black people in 12 states in the South between 1877 and 1950.

"There's this vast, invisible universe of unknown victims who were murdered far from a reporter's pen."

As she works to shed light on these cases, Burnham is often reluctant to tell her own story, even when discussing her life's work. "I really don't want this to be about me," she told me. But her past merits some mention, given her own ties to the struggles of the Jim Crow era. She was born in Birmingham in 1944. Both her parents were passionate activists for racial equality. Her father, Louis Everett Burnham, helped organize voter registration campaigns in the 1940s and was once arrested for dining with a white couple in a Black-only restaurant. The city's police commissioner, Eugene "Bull" Connor, a Klan supporter who later became notorious for

28

turning dogs on Black children, threatened to lock him up for his work leading the Southern Negro Youth Congress.

When Burnham was a young girl, her mother was friends with another SNYC member, a schoolteacher named Sallye Bell Davis—whose daughter, Angela Davis, became Burnham's lifelong friend. Burnham went to the University of Pennsylvania for law school, while Davis became a political activist, scholar, and author widely known for her work on prison abolition. When the police arrested Davis in 1970 in connection with an armed takeover of a California courthouse, Burnham was the first lawyer to represent her in New York. "She was the only attorney who remained with me from the moment of my arrest until the moment of my acquittal," Davis recalled later.

Burnham started her legal career with the NAACP Legal Defense and Educational Fund, and in 1977 she became the first Black woman to serve as a judge in Massachusetts when she was appointed by Gov. Michael Dukakis. In 1993, South African President Nelson Mandela asked her to join a precursor to the Truth and Reconciliation Commission that investigated alleged human rights violations in his country under apartheid.

By 2007, Burnham was teaching at Northeastern University when Rep. John Lewis introduced the Emmett Till Act, which gave the Justice Department funding to examine civil rights–era homicides and help local attorneys prosecute perpetrators who were still alive. "I really truly believe, in the depth of my soul, that if we're going to have peace, if we're going to have healing, if we're going to move closer and closer to that sense of community—then everything must come out," Lewis told PBS's Frontline. "We must tell the whole story, the complete story. People need to know."

After Lewis introduced the act, Burnham quickly organized a conference to connect family members with prosecutors who might examine their cases. There, she met Thomas Moore, a man from Mississippi whose 19-year-old brother had been lynched by the KKK in 1964. Authorities discovered his body in the Mississippi River while searching for three Freedom Summer activists abducted and killed by the KKK earlier that year in the notorious Mississippi Burning murders. (Burnham, who was just 19 then, had known two of the activists personally.) After the conference, she helped Moore sue local law enforcement for complicity in his brother's killing. Working on that case got her thinking more about other families who lost relatives to racist violence and never received any measure of acknowledgment in court.

The Emmett Till Act, by funding prosecutors to examine decades-old murders, was a way to help those families. But to Burnham, the new bill had some limitations: The act directed the Justice Department to focus mostly on killings from the 1950s and '60s, leaving earlier Jim Crow cases untouched. And the investigations that resulted from the Emmett Till Act usually didn't lead to new convictions; by 2019, only five people had been prosecuted because of the law. Families whose cases could not be brought to trial were left with little recourse.

So Burnham launched the Civil Rights and Restorative Justice Project to investigate killings that the Justice Department would not. Her team found that at least 1,100 Americans died in racially motivated violence from 1930 to 1955 alone. She and MIT scholar Melissa

Nobles created an archive to put records of these Jim Crow killings in one place, to help the public see the pervasiveness of the violence. (It will go online in 2022.)

At least 1,100 Americans died in racially motivated violence from 1930 to 1955 alone.

Burnham's team has since investigated about 650 of these cold-case killings and plans to use grants, donations, and other funding to examine hundreds more. Where the Justice Department focuses on prosecutions, Burnham's team tries to do "whatever the families feel is important today to grapple with this traumatic history." That can range from asking governments to correct false records, to putting up monuments for the deceased or holding ceremonies in their memory, to teaching kids in schools about what happened.

Unearthing the past could help scholars acknowledge the long contrails that extend from racist violence. "Historians like to use the past tense," says Williams, the Wayne State scholar. "Survivors often use the active present tense, as in: This is still happening to me. I am still living with the fallout."

On the Saturday night in 1955 when John Earl Reese was shot, as Nelson-Crockett sought treatment for her gunshot wound at a hospital, the same men who killed her cousin hours earlier rampaged through a mostly Black neighborhood in Mayflower. They fired about 27 shells, including at a school for Black children, a school bus, and the house of a woman who was praying at her bedside.

Afterward, law enforcement arrested two Black men and wrongly blamed them for Reese's death. With that, the county government essentially gave up its investigation of Reese's killing.

But residents in Mayflower suspected a cover-up. Sheriff Herman Orr had been in the neighborhood on the night of the rampage, not far from where the white men stood as they fired bullets into the school. And he knew one of the shooters personally, leading some residents to speculate that he could have stopped the violence but instead turned a blind eye.

Ronnie Dugger, the founding editor of the Texas Observer, wasn't ready to let the case drop. He found a shell from one of the bullets and published a photo of Reese's body, drawing attention from the national press. A Texas Rangers investigation led to the arrest of the actual gunmen, Perry Dean Ross and Joe Reagan Simpson, who both confessed. Ross told investigators he fired his rifle into the cafe while speeding down the highway with Simpson. "I held the steering wheel with my left hand and laid the gun across the left door," he said. "I was going about 85 miles per hour at the time." It was a clear admission of guilt. But Simpson was never tried.

Half a century later, when the Justice Department looked into Reese's death again after the Emmett Till Act passed in 2007, it closed the case because the perpetrators were no longer alive.

Burnham learned about Reese's murder after launching her project that year. Back in 1989, during the dedication of a civil rights memorial in Montgomery, Alabama, his name was listed between those of Emmett Till and Rosa Parks. Despite this recognition, no one in Texas

had ever determined how government officials allowed two white men to walk free after they had confessed to killing the teen. "It's important to acknowledge where a justice system failed its community," she told the Longview News-Journal in 2009. "No one ever came to Ms. Nelson and asked her what happened. 'Sorry' is an important word for somebody in that position to hear. She's not hearing that from her own community."

Burnham also hoped her students could illuminate the circumstances leading to Reese's murder, including the fight to desegregate the county's schools. Early the next year, she sent Kaylie Simon, then a 25-year-old law student from California, down to Texas. Simon had applied to Northeastern specifically to work with Burnham, whom she'd learned about while studying with Professor Angela Davis as an undergrad at UC Santa Cruz.

Simon had never been to Texas when she and Janeen Blake, a recent law school graduate from New Jersey, flew to Dallas. They passed oil refineries and Confederate flags on their way to the eastern edge of Texas, the last state in the South to stop enslaving Black people. The cafe where Reese was shot had been located in rural Gregg County, and Nelson--Crockett, who'd recently retired as a maid and caretaker, was raising her 17-year-old granddaughter, Kimyonia Bowman, in the nearby town of Tatum. She hadn't told Bowman, who knew little about Reese's death, about the students or their project.

When Simon and Blake arrived, Nelson--Crockett greeted them with a warm smile and ushered them inside, showing off her deep freezer that contained the large perch and catfish she'd caught in a nearby lake. Then she invited them to sit around the kitchen table to talk about her cousin's death.

Looking down often at the scar on her wrist, Nelson-Crockett recounted details about the shooting that the students had never heard. The day after Reese was shot, she recalled, her grandmother, who had helped raise her and Reese, was thrown in jail. Law enforcement accused her of shooting the kids herself to collect insurance money—something everyone in town knew was a lie. "What insurance money? We didn't have enough money to bury the boy," Nelson-Crockett later told the Longview News-Journal.

Then Burnham's students began to reveal the details they had dug up through public records, interviews, and old newspapers with help from an East Texas archivist and Texas Observer editor Ronnie Dugger. The students told Nelson-Crockett that Joe Simpson, one of the shooters, had an uncle named Jim Kuykendall, who was an influential man in Tatum at the time of the killing. Kuykendall. The name must have sent chills up Nelson-Crockett's spine.

"The majority of the white people would rather build us a school instead of letting us go to school with them."

In the months leading up to Reese's death, Kuykendall and some other white residents were especially active in debates about school segregation. In 1954, a year before the shooting, the Supreme Court had issued its Brown v. Board of Education decision, declaring that "separate but equal" schools for Black and white kids were unconstitutional. Because many white people in the Tatum-Mayflower school district didn't want to desegregate, they voted in 1955 to spend money improving the all-Black Mayflower High School, hoping it might convince the kids to

31

stay there rather than enrolling in the all-white Tatum High. "The majority of the white people would rather build us a school instead of letting us go to school with them," a Black resident later told the Star-Telegram. But some white voters, the resident added, "didn't want anything for us" and fiercely opposed spending any money on Black students. Kuykendall led the faction fighting against the funds.

The day after a bond for Mayflower High School was approved, a large skull-and-crossbones image appeared on the window of the county tax assessor, alongside racist slurs including "Negro lover." A few days later, Kuykendall's nephew Joe Simpson was caught with a slip of paper in his pocket that showed a nearly identical drawing. Simpson and Ross later admitted they shot up the cafe because they were angry about the school upgrade for "uppity Blacks."

Nelson-Crockett already knew that Simpson was never tried for her cousin's death. She knew Ross confessed to investigators and was convicted by an all-white jury of murder but was then let off the hook during the sentencing hearing—after his defense attorney had asked them to "call it a bad day and let the boy go on in life." (The prosecutor recommended a five-year prison sentence, but the jurors handed Ross a suspended sentence of five years' probation, sparing him prison time.)

She knew that the grand jury that had indicted Ross declared that racism had nothing to do with the violence, and that Reese's death certificate still claimed his killing was an accident.

Nelson-Crockett remembered all that. But she had never heard that Kuykendall was connected to the killers. It made her go quiet in her chair, as the weight of it all sank in: She'd spent much of her adult life working as a maid and caretaker in the home of Kuykendall's son.

As Nelson-Crockett's granddaughter Kimyonia Bowman eventually learned the details of the murder, she grew frustrated that her schoolteachers at Tatum High had never mentioned the drive-by shootings even once. How can this be swept under the rug when so many families were affected? she thought.

When Burnham's students visited Nelson--Crockett's home, they asked whether there was anything they could do to help her family heal from Reese's killing. Even though prosecuting the killers was no longer possible because both men were dead, there were other ways to recognize the trauma that they had endured. Nelson-Crockett and other community members told Burnham's students that their main goals were to set the record straight and for authorities to condemn the violence.

So in July 2010, Simon helped arrange for Nelson-Crockett to meet with local officials about what happened to her in the cafe. On the drive over, Nelson-Crockett seemed nervous and, worried she might not have the strength to recount her experiences, asked Simon to do most of the talking.

But the meeting went better than expected. After Nelson-Crockett told her story, one of the officials, the mayor of the nearby town of Henderson, promised to issue a public statement deeming the shootings an injustice. Afterward, Nelson--Crockett seemed lighter to Simon,

skipping as they walked back to the car. "I can't believe they never knew what happened to us," she told Simon. "I am glad they know now."

In October 2010, on the 55th anniversary of the shooting, community leaders gathered at the library in Tatum, where the librarian hung a plaque honoring Nelson--Crockett, her sister, and Reese as "victims of anti–civil rights violence." Simon presented the librarian with a binder of her research so people could learn more about Reese. (She also developed a curriculum about Reese's story for teachers to use at Tatum High School.)

From the library, the crowd drove to Mayflower, stopping near a church that had been sprayed with bullets the night of Reese's killing. There, on the same road that Reese walked to get to school, a new street sign bearing his name gleamed in the sun. "That to me was really nice," says Bowman, Nelson-Crockett's granddaughter. "It was a tear-jerker because you knew finally his name was being said."

Earlier that day, the family visited a graveyard where Reese's old tombstone had long stood, its hand-carved epitaph stating the wrong date of death. Beside it, along with bouquets of roses, now stood a new tombstone declaring Reese's real date of death and referring to him as a "civil rights martyr."

Reese's 54-year-old half-brother, who was born after the shooting and also named John Reese in memory of his deceased sibling, was present at the ceremony. "It was just mind-blowing that she would go and dig up the truth and come back and report it without sugar--coating it," he says of Simon. "Some people now, they would be like, 'That was a long time ago. We can't be held accountable for something they did back then.'"

But he wished county officials did more to acknowledge their own role in allowing the killers to walk free. "It was a cover---up," he says. "Gregg County is just as guilty as the guys that did it, and I don't think anyone [from the county] said anything like they were sorry it happened."

A couple of months after the ceremony, at Simon's request, the county issued a new death certificate for Reese, declaring that he was killed by homicide and not in an accident. When Nelson-Crockett found out about the change, "she could not hold her tears back," her granddaughter Bowman recalls. "She would always say, 'Oh, I wish his family could have been here to see this.'"

"I don't think my grandmother ever thought in her mind that she would live to see what happened," Bowman adds. "I don't think she ever thought she would see that change."

Not everyone is as eager as Nelson--Crockett to dig up the past. Some survivors, still grappling with their trauma, have resisted working with Burnham's students, or find the process so painful that they stop engaging with them. Some families doubt they'll find any benefit in unearthing their losses so long after the crime.

That was the case when Recie Gilbert Moss, now 94, first heard that Burnham was looking into her childhood trauma. She had been 19 back in 1947 when her father, Henry "Peg" Gilbert, was killed by Harris County, Georgia, law enforcement. He was a deacon and

33

community leader, with a plot of 111 acres to his name that made him a subject of envy among his white neighbors. One day, the police chief arrived at the property and accused him of helping another Black man escape law enforcement, something Gilbert and his family denied. Three days later, Gilbert was found dead in a jail cell, his skull shattered, his legs broken, and his body riddled with bullet holes. The police chief claimed to have beaten him in self--defense. Nobody ever faced charges.

After Gilbert's death, his 111 acres went up for auction, selling for dirt cheap to a white farmer. The family left town, and the children were raised by relatives. Almost 70 years later, Gilbert's two surviving daughters, Recie Gilbert Moss and Mattie Gilbert, avoided talking about his killing. White newspapers at the time of their father's murder had described him as a criminal who attacked the police in jail, an allegation the sisters insisted wasn't true. Yet decades later, shame and anger still clung to the memories. Some of their own children didn't even know what had happened to him.

When Burnham's student Tara Dunn started investigating the family's story in 2015, Gilbert Moss, who was living in Detroit, wanted nothing to do with her work, at least initially. Thinking about the past hurt too much, and she didn't see an upside. Dunn sent messages to the Gilbert sisters through a relative who acted as a mediator, explaining how she hoped to correct the record and reveal evidence they might not have: The police chief, Dunn learned, had been nearly two decades older than Gilbert at the time of his murder, and significantly smaller. There's no way one 65-year-old man could have inflicted those injuries on a man 20 years younger, twice his size, Dunn emphasized. The chief likely had help.

After Dunn and another student joined the sisters for a meal at a Baptist church in West Point, Georgia, the sisters began to warm to the researchers. They invited them over for an interview at Mattie Gilbert's home.

But when Dunn began asking about information she'd found in old media reports—articles by white journalists suggesting that Gilbert had been an aggressor in jail—it was too much for Recie Gilbert Moss. She stood up from her chair and shouted her disapproval. "These are all lies! They're lies!" Dunn recalls her saying. The students gave her some space. "Nobody said, 'Calm down' or 'It's gonna be okay.' We just listened," Dunn recalls.

Afterward, Gilbert Moss flew home to Detroit, and she didn't return when her sister agreed to sit for a second interview with the law students. (Through one of her children, Gilbert Moss also declined to be interviewed for this article.)

Later, when Burnham helped organize an event in Georgia to honor Henry Gilbert in 2018, Gilbert Moss decided not to attend, telling her daughter Sheila Moss-Brown that it would be too gut-wrenching. (Her sister didn't attend, either—she died in 2016.)

But other family members did participate, talking afterward with a film crew that was making a documentary about Gilbert. And slowly, Gilbert Moss came back to her father's story. The first time she tried to watch the film, she became so sad that she needed to turn away from the screen after a few minutes. But in March this year, she decided to sit through the entire documentary when her relatives watched it together during a Zoom call, and she remarked

afterward that she appreciated how the students included a quote from her at the end. "It was easier for her to watch it with family members there," says her daughter Moss-Brown.

In 2016, Karen Branan, a writer whose grandfather was the sheriff at the time of Gilbert's murder, learned about Burnham's project. A year later, she wrote to Gilbert Moss, apologizing for the way her father's life was cut short. Today, Gilbert Moss continues to exchange letters with her. "She's honored that the truth is coming out," Moss-Brown says of her mom's appreciation for Burnham's project. "Is she completely healed? No. Has it helped tremendously? Absolutely."

Since the uprisings that spread after a Minneapolis police officer murdered George Floyd, Black Americans have had a larger platform to share their experiences with racist violence. For relatives of people murdered in the Jim Crow era, new killings can compound traumas that began decades ago. "These wounds have never healed," says Burnham. "There's not a Black person alive today who doesn't know something about Emmett Till. There's not a Black person alive today who won't forever hold in their minds the lynching of George Floyd. These things are traumatic and personal, and they leave one feeling a kind of vulnerability associated with race that is uniquely American."

The families whose loved ones were murdered during the Jim Crow era "were not the beneficiaries of a George Floyd moment," Burnham adds. "They did not have access to court proceedings. They did not have lawyers who would work with them to identify a course of justice, and they didn't have community support." Through her project and its focus on restorative justice, she hopes to create that community support for families who never got it, by bringing together relatives and neighbors to honor each other's memories and organize for change.

"These things are traumatic and personal, and they leave one feeling a kind of vulnerability associated with race that is uniquely American."

And she hopes to create some measure of justice. In 2018, Harris County Sheriff Mike Jolley made a statement during a church gathering about Gilbert's murder, declaring that the "criminal justice system had failed." Darren Mills, Gilbert's grandson, told a filmmaker afterward that the sheriff's statement didn't solve much—because the family was still missing its 111 acres. "As long as you keep our inheritance, you can stand up and say you sorry," he said. "What you gonna do after sorry? As long as we don't have what my grandfather and grandmother worked so hard for, our family tree is still broken."

Burnham's project cannot restore that inheritance. But Woodruff, the Penn State professor, believes it might lay the groundwork for future generations to regain some of their stolen wealth, by documenting the losses their families experienced. "There has to be a record of harm done if we ever have a reckoning, whether it's some form of reparations or whatever it may be," she says. Burnham and her team, Woodruff hopes, "will provide a lot of evidence."

"By piercing the silence that tends to surround these histories, the erasure, by making it visible, the project places pressure on the society itself to face its history and come to terms with the ways we continue to be haunted by these histories and their legacy," says Ward, the

Washington University professor. "And out of that pressure comes a larger number of people saying, Yes, we have to acknowledge this history, we have to think about and pursue reparations. That's the only way we can get to reconciliation."

Burnham's project has, at least in one case, prompted a kind of informal reparations: The daughter of one of Reese's killers, a woman named Sandra Simpson--Kraft, read the project's research and decided to name Reese's surviving family members in her will.

The ripple effects of Burnham's work also extend to the 200-plus students who have examined these cases, graduated, and sometimes become attorneys and journalists. Today, Kaylie Simon is a public defender in California, representing many people of color who can't afford to pay for a lawyer. Her time with Burnham made her more eager to take on this job and helped her understand clients who don't trust the legal system because of how their families have been wronged by it in the past. "Getting to study and work with Professor Margaret Burnham has been one of the most powerful, life-changing experiences, professionally and personally," she says.

Years after her visits to Texas, Simon keeps in touch with Nelson-Crockett's granddaughter Kimyonia Bowman, who still lives near Tatum. Bowman has tried to find new ways to honor Reese; last October, she arranged for a local television station to film a pilgrimage, organized by an Episcopal priest, from the hospital where Reese died to his graveside.

Nelson-Crockett wasn't there for the march: She passed away in 2013 at the age of 71. Bowman keeps a dresser drawer filled with her grandmother's memories, including a lock of her grandmother's hair, her hats and birthday souvenirs, and every newspaper clip and interview note the students sent them about Reese. She asked me for a copy of this article to add to the collection. "I've always said that if I have kids, I'm gonna be like, 'You're gonna keep this,'" she says of the documents in the drawer. "'You're gonna take care of it.'"

36

# EXAMPLE 4

**The 2024 Mother Jones article tiled "The Dark Side of the $100 Bill."**

Summary:
The 2024 Mother Jones article, "The Dark Side of the $100 Bill," explores the widespread use of $100 bills, highlighting their role in global criminal activities. Despite being the most common denomination, $100 bills are rarely used by ordinary Americans, often being preferred by kleptocrats, tax evaders, and drug cartels due to their high value and portability. The article discusses how a significant portion of these bills circulate outside the U.S., aiding in money laundering and other illicit activities. It suggests that the federal government's ongoing production of $100 bills inadvertently supports these global criminal enterprises.

**OLIGARCHY**

The Dark Side of the $100 Bill

Benjamins are fueling international crime and corruption. So why are we printing more than ever?

OLIVER BULLOUGH

JANUARY+FEBRUARY 2024 ISSUE

When the US targeted Russia's oligarchs after the invasion of Ukraine, the trail of assets kept leading to our own backyard. Not only had our nation become a haven for shady foreign money, but we were also incubating a familiar class of yacht-owning, industry-dominating, resource-extracting billionaires. In the January + February 2024 issue of our magazine, we investigate the rise of American Oligarchy—and what it means for the rest of us. You can read all the pieces here.

The most profitable, and perhaps most dangerous, factory in the United States is a two-story, off-white block about 20 minutes north of central Fort Worth, Texas. It resembles many of the other buildings in a rather barren suburb along US 287, and, had there not been a large sign inviting passersby to visit, I would have driven past without a sideways glance.

Inside, it looked no more remarkable. A man in a Carhartt T-shirt and baseball cap walked slowly across the patched concrete floor; a woman with a blond ponytail in a black scrunchie jacked up a pallet; union T-shirts bearing the word "Solidarity" were the most common item of clothing. There was an unfamiliar smell: Imagine a new car filled with the hot air from a vacuum cleaner.

A half-dozen or so of us visitors looked down onto the shop floor's battery of cream-painted printing presses from a glass-enclosed walkway. Had we been unaware of what the factory makes, we would have struggled to grasp it, for the printers worked at astonishing speeds, spitting out up to 10,000 sheets an hour in a green-gray-black blur. But the machines' operators moved at a human pace and, when they stacked the sheets into piles, the nature of the product was obvious.

This enormous shed is the Western Currency Facility, one of the federal government's two money-printing operations. (If "FW" is printed in small letters on the corner of a bill, it was printed there.)

The WCF produces more than 14 million banknotes a day. To keep up with the insatiable demand for dollars, it has invested in Super Orlof machines, which can print 50 bills simultaneously. The facility is set to gain an extra 250,000 square feet of floor space to ramp up capacity.

In one way, this is all as it should be. When Congress created a central bank in 1913, it aimed to bring order to the nation's erratic monetary system. Back then, banknotes were scarce when there was high demand, such as at harvest time, meaning interest rates went up and the

39

economy suffered. The new Federal Reserve tasked with creating currency "elastically," with the explicit instruction to contract or expand the money supply based on demand.

In October, $2.33 trillion worth of banknotes were in circulation, more than triple the amount two decades ago. This is a testament to the effectiveness and innovation of the Treasury Department's Bureau of Engraving and Printing, which runs the Fort Worth site. But in another way, this apparent success story is alarming, because it highlights how incurious officials (including lawmakers with oversight authority) have almost always failed to ask two key questions: Where are all these dollars going? And who's using them? Because they're not being used by ordinary Americans, and they're not in the United States.

At the end of 2022 there were 18.5 billion $100s out there, and the Treasury Department printed another 1.5 billion in 2023.

Surveys from Pew Research Center show a consistent decline in cash usage, with more and more Americans shopping online, using Venmo, and scanning their phones when they buy a coffee. Two-fifths of Americans use no cash at all in an average week, up from a quarter in 2015. The proportion of people who exclusively use cash has dropped accordingly, to fewer than one in seven, and when they do use cash, the transactions are smaller.

This is not purely a US phenomenon. The paradox of cash usage falling while cash demand rises was identified by Andrew Bailey, then the Bank of England's chief cashier, in 2009. A similar trend is visible in the European Union. Central Bank officials have made various suggestions about who is using all these banknotes, normally derived from macroeconomic theories, but they rarely tackle the obvious explanation: The primary customers for their product are criminals, and the explanation for rising demand is a growing criminal economy.

America is an outlier from its Western peers in one crucial respect. In Britain, the largest share of the outstanding currency is made up of 20-pound notes, which are widely used; in the eurozone, likewise, it's the omnipresent 50 euro banknote that is most often printed. In the United States, however, it's the $100 bill, which most Americans rarely encounter. ATMs typically don't dispense them; shopkeepers regard them with suspicion. Whoever is using them, it's not ordinary Americans.

The $100 bill overtook the $1 bill as the most common denomination six years ago, and the trend has accelerated since: At the end of 2022 there were 18.5 billion $100s out there, and the Treasury Department printed another 1.5 billion in 2023. Of the total value of currency in circulation, 80 percent consists of notes with -Benjamin Franklin's face on them. Tracing bills in circulation is tough. But in 2017, Ruth Judson, a Federal Reserve economist, tried to answer the question of where they're going by comparing statistics for US and Canadian dollars. Her conclusion was that about three-quarters of all $100 bills were outside the United States. If the trend she identified has continued, that total would now be more like 80 percent.

"There is little question that cash plays a starring role in a broad range of criminal activities."

But who are the foreigners who want these banknotes, which are universally accepted and can't be traced? Kleptocrats, tax dodgers, and cartels; anyone who has money to move in bulk,

40

and scrutiny to avoid. And why do they prefer $100 bills? A million bucks in $100s weighs 22 pounds, five times less than the same amount in $20s. If you have a lot of currency to move, you want it to weigh as little, and take up as little space, as possible.

When US politicians first became concerned about money laundering, back in the late 1960s, the connection between crime and cash was so widely acknowledged that congressional committees regularly heard about private jets shuttling loads of currency to Caribbean tax havens, Hong Kong, or Switzerland. Eventually, in the 1980s, their concerns translated into concerted international efforts to tackle money laundering. And if you look at a graph of US currency in circulation, that is also precisely when the line showing the production of $100s begins to rise. As the financial system became more sophisticated in subsequent decades, journalists tended to focus on the latest tools available to criminals, which at the moment are cryptocurrencies. But their use is minuscule compared with paper money. In fact, as checks on digital money transfers have become more onerous, criminals have relied on the one form of currency that can't be found on a spreadsheet: cash. (I asked officials at the Fed and the Treasury Department for comment; they declined or did not respond.)

"There is little question that cash plays a starring role in a broad range of criminal activities, including drug trafficking, racketeering, extortion, corruption of public officials, human trafficking, and, of course, money laundering," wrote Kenneth Rogoff, a Harvard professor and former chief economist at the International Monetary Fund, in his 2016 book, The Curse of Cash. "The fact that large notes are used far more for illegal activities than legal ones long ago penetrated television, movies, and popular culture. Policymakers, however, have been far slower to acknowledge this reality."

The unfortunate conclusion is that, by issuing this huge volume of $100 bills, the Fed is helping the world's worst people evade law enforcement. Former Treasury Secretary Larry Summers seems to agree. In 2016, he wrote that a "moratorium on printing new high denomination notes would make the world a better place."

Even so, no US officials appear to be clamoring for such a move. By printing "$100" on a piece of paper, at a cost of around 9 cents, the federal government makes it worth $100—which is why the WCF is the most profitable factory in the United States. Fed officials would be quick to point out that they are not technically making a profit of $99.91 every time they print a Benjamin, since the bill can be redeemed at any time. But as Fed official Christopher Neely wrote in 2022, "If the cash never comes back to the U.S., then Americans have just exchanged pieces of green paper—which cost almost nothing to print—for valuable goods. This is a good trade for Americans."

That's an understatement. The benefits from printing so much cash are colossal for the government. But the costs, almost entirely paid by victims of crime, tax evasion, and kleptocracy, are commensurate. Perhaps we should be asking ourselves whether this trade-off is worth it.

41